SUNDAR, J.T.C.
Defendant (“Taxation”) moved for summary judgment contending that plaintiff (“J & J”) is liable for use tax on its out-of-state purchases of parts which are shipped to J & J in New Jersey and assembled as pretzel warmers/display eases (“Warmers”) by J & J in New Jersey. J&J cross-moved for summary judgment maintaining that the tax does not apply because (1) the Warmers are merely stored and/or withdrawn from storage before they are sold or distributed to J & J’s out-of-state customers; (2) the Warmers are an integral part of the manufacturing process of the frozen soft pretzels sold by J & J, thus are exempt from use tax under the manufacturing exemption; and (3) Taxation is estopped from its assessment under the equitable doctrines of estoppel and laches because in its 1993 audit involving the same Warmers, Taxation had concluded that J&J was subject to use tax only for the Warmers that were sold or distributed to J & J’s New Jersey *537 customers based upon the Supreme Court’s holding in Cosmair, Inc. v. Director, Div. of Taxation, 109 N.J. 562, 538 A.2d 788 (1988), and here it is undisputed that J&J paid such tax.
As more fully set forth below, the court finds that the purchase of the Warmer parts are subject to use tax. The holding in Cosmair that the fragrance/cosmetic samples manufactured by a taxpayer, stored in its warehouse and shipped to out-of-state customers for free distribution to consumers is not subject to use tax, does not apply to the facts of this case. Further, the equitable doctrine of laches or estoppel does not apply because Taxation’s 1993 final determination was an erroneous application of the law; J & J did not prove any detrimental reliance; and there are no extreme circumstances which outweigh the public interest in tax assessments and require application of the equitable principles. However, the court finds that interest and penalties on the assessment should not apply pursuant to N.J.S.A. 54:49-11(b).

FACTS

J & J is a New Jersey company. It owns and operates three facilities in Pennsauken, Bellmawr and Bridgeport in New Jersey. It manufactures and sells soft pretzels which are produced in its Bellmawr and Pennsauken plants.[1]
The pretzels are sold either freshly baked or as frozen. Frozen pretzels are sold to retail food service vendors or providers, which in turn, sell them to sports stadiums, amusement parks, movie theaters, and food service departments of retail stores such as Target. They are also sold to retail food service vendors such as Rita’s Water Ice, and to supermarkets. One of the brand names is “SuperPretzel.” The frozen pretzels are generally re-heated and sold on premises by the food service vendors to the consuming public. Those purchased from the supermarkets are sold for at-home consumption.
*538 The parent company, J&J Snack Foods Corp. (“Parent”), is a publicly traded entity and listed on the stock exchange.[2] In its annual report, the Parent stated that its “principal marketing program in the Food Service segment includes supplying ovens, mobile merchandisers, display cases, warmers ... to the retailer to prepare and promote the sale of soft pretzels.”
J&J developed, among others, the Model 2000 pretzel warmer (the subject of this litigation, hereinafter “M2000 Warmer”), which thaws out the frozen pretzel that is placed on a “rotating tree,” warms it, and keeps it warm for about three hours. Although a customer could use any oven to warm J & J’s pretzels, the use of the M2000 Warmer ensures that all pretzels sold to consumers are warmed on a consistent basis avoiding producing pretzels which are either not fully thawed or burnt (which could occur when other devices or ovens were used). The M2000 Warmer is designed for lower volume users. Customers usually sell the warmed up pretzel (using the M2000 Warmer) to ultimate consumers within a week of J & J’s delivery of frozen pretzels. The Warmers include the name of J & J and the trademarked “SuperPretzels, Soft Pretzels” in stylized script. Thus, the M2000 Warmer also functions as a display ease used to promote J&J products.
The M2000 Warmers are either sold or loaned to J & J’s customers. They are loaned to J & J’s customers who purchase more than two or three cases of pretzels a week (or about 100-150 pretzels), and decide to use the M2000 Warmers. Customers who purchase less than this amount have to buy the M2000 Warmer from J & J, if they desired to use the same. If loaned, J&J enters into a “Location Agreement” with the customer. The agreement requires a refundable deposit, and states that the equipment loaned (including but not limited to-the M2000 Warmers), among others, (1) must be used solely for the “sale and promotion of J & J products; (2) is the property of J & J and can be removed only by a J & J representative; (3) can be removed or replaced at any time by a J & J representative for improper use; *539 and (4) must be displayed in a prominent place to aid promotion and sale of J & J products. Another sample of the Location Agreement included a clause for return of the deposit. However, a deposit is rarely, if ever, collected. The parties agreed that J & J provides the M2000 Warmers to its customers free of charge despite the Location Agreement’s deposit clause.
After J & J’s sales department conveys a request for the M2000 Warmers, J & J’s service department orders parts for the same from out-of-state third-party vendors. J & J’s cost for a Warmer is approximately $290. J&J uses account number 6350 to record the purchases of the Warmer parts or replacement parts.
Upon receipt of the parts, the service department assembles them (in 19 steps[3]) after which they are tested. The assembly requires one to five persons depending on the quantity of Warmers to be shipped. The entire process was described by a J & J employee as “we get an order in from Sales [department], we got the parts on the bench, we have people put the warmer together, plug it in, the lights work, three turns, put it in a box and ship them right out.” All assembly and testing is done by J & J in its Bellmawr facility. The assembled and tested Warmers are then shipped to J & J customers, either in-state or out-of-state, via UPS. Only the M2000 Warmers are assembled in New Jersey and then distributed, and it has been this way for at least 40 years (albeit under a different model number).[4]
J&J does not keep an inventory of M2000 Warmers or the Warmer parts (ie., stock them). The parts are ordered from its vendors on an as-needed basis. The Warmers are shipped out immediately after they are assembled and tested. Neither the parts nor the Warmers are entered in J & J’s data system with *540 any serial numbers. If a Warmer is returned for repairs, J&J does not cross-reference it with any serial numbers in its database, but simply checks the type of model (model number) and either repairs or replaces it for the customer. Returns are tracked only through the UPS form. J & J’s does not have its own return merchandise form.
The parts or the Warmers are not considered or reflected on J & J’s books or tax returns as “cost of goods” sold. The cost for parts and labor of the M2000 Warmers are expensed on J & J’s books as a marketing expense. Labor costs relative to the Warmers are treated distinct from the pretzel manufacturing costs, and thus, are not part of the cost of goods sold in terms of inventory. The Warmers are expensed as they are assembled. Thus, the costs of the parts and the labor are “recorded as an expense, a deduction to income” and are not capitalized. Although J&J could capitalize an item if the cost exceeded a certain dollar amount, which an employee hazarded was about $300, amounts expensed under account 6350 were not capitalized even if in excess of $300 since it could represent a total of several items. The Warmers are not included as any type of asset or equipment on the balance sheet, either as such as under the category “plant and equipment.”

PROCEDURAL HISTORY

Prior Audit

In 1992, Taxation audited J & J.[5] The purchases of parts/replaeement parts for the same M2000 Warmers (albeit under a different model number), which were assembled in New Jersey and categorized in J & J’s account number 6350 as “marketing and promotional aids,” were examined in terms of their taxability. The auditor also listed other items such as purchases of ovens parts, whipper parts, ovens and freezers. The total use tax on these items was computed at $71,377.42, of which 10% was allocat *541 ed to “purchases used in New Jersey” and tax on this allocation or $7,137.74 was imposed.
J&J filed a timely administrative protest contesting the imposition of the entire use tax of $71,377.42. It contended that the tax related to “marketing equipment, display cases and marketing parts which are purchased or constructed by [J & J] for resale to its customers substantially all of whom” were out-of-state. It argued that the transaction was a resale because in return for the purchase or possession of the Warmers, the customer agreed to forbear from “selling similar products of ... competitors.” It referenced a Location Agreement where the customer agreed to “purchase product only from” J&J during the term of the agreement. It cited to Fairlawn Shopper, Inc. v. Director, Div. of Taxation, 98 N.J. 64, 484 A.2d 659 (1984) for the proposition that “economic realities” must be acknowledged, the economic reality being “the consideration flowing to [J & J] from the transfer of possession of the equipment at issue [was] the exclusivity of the business relationship between [J & J] and its customers.”
By final determination of November 5,1993, Taxation concluded that “only the ... promotional and marketing equipment which is delivered to [J & J’s] New Jersey customers for use in this State is subject to” use tax based upon the ruling in Cosmair. There was no Schedule of Liabilities attached to the final determination to show the tax due pursuant to the final determination. J&J did not appeal the final determination.
Since 1993, J&J has paid tax (calling it sales tax) only upon the Warmers/Display cases sold or distributed to its New Jersey customers. J & J’s business with respect to the loaning or sale of the Warmers to its customers has remained unchanged since the 1992-93 audit.

Present Audit

In April of 2008, Taxation audited J&J. The tax periods involved were April 1, 2004 through March 31, 2008. It determined that no sales tax was due as J & J’s food sales were all for resale.
*542 Because J&J was nonetheless paying sales tax, the auditor inquired into the transactions requiring such payment. He found out that J&J was paying tax on marketing equipment sold or loaned to its New Jersey customers. J&J identified the equipment as the pretzel Warmers which J&J would purchase, either fully assembled or as parts from its vendors, and have the purchases either directly shipped to J & J’s customers or delivered to J & J’s New Jersey locations. The auditor then examined vendor invoices for the marketing equipment.[6] He determined that J&J was paying use tax (but calling it sales tax) on Warmers sold or distributed to J & J’s New Jersey customers, but failed to do so “on parts first sent to J & J’s New Jersey location.” Based on documentation, the auditor found that about 34% “of all ‘marketing equipment’ purchased is shipped to New Jersey locations” while 66% was “dropshipped” to its out-of-state customers.
The auditor concluded that Warmer parts which were sent by J & J’s vendors to New Jersey were subject to use tax even if the assembled Warmers were subsequently shipped by J & J to out-of-state customers under the Location Agreement. This was 34% of all the marketing equipment purchased by J & J, which totaled to 10,318 loans of Warmers/Display cases and 752 sales of the same. He did not include Warmers which were directly drop-shipped to an out-of-state J&J customer. He did not impose additional tax for about 5% of the loaned Warmers which were returned to New Jersey and either discarded or refurbished and re-lent/sold to another J&J customer.
The auditor then examined all of J & J’s arguments against imposition of a use tax based on the 1993 final determination. He methodically responded to each one, and concluded that the prior audit’s concession was erroneous because J&J was loaning the Warmers and retaining ownership to the same, but not giving *543 them away, which, according to the auditor, was a significant distinction from the facts in Cosmair.
The audit resulted in an assessment of use tax of $258,227. With interest ($122,957.42) and penalty ($25,822.70), the amount totaled to $407,007. J&J promptly paid the tax portion of the assessment ($258,226.99).
J&J filed an administrative protest against the audit. Taxation issued a final determination on April 10, 2012. It reduced the assessment for certain promotional items (printed advertising material, bags and umbrellas) shipped out-of-state. However, it agreed with the auditor’s assessment of use tax upon the Warmers parts shipped into New Jersey and for which J&J had not paid use tax. It noted that the “warmers are not considered promotional and marketing materials” under N.J.S.A. 54:32B-8.39 for that exemption to apply. Further, per Taxation, the manufacturing exemption did not apply since the warmers were not “manufacturing equipment” and even if they were, the “process of heating the pretzels [was] performed” by J & J’s customers, thus, the exemption would not be available to J & J. Taxation also stated that the Warmers were taxable since they had “acquired taxable situs” under N.J.S.A. 54:32B-6(C). Finally, Taxation noted that the 1993 audit results did not estop Taxation from imposing the present assessment because “equitable estoppel does not apply against ... Taxation when the Taxpayer has relied on a previous position of ... Taxation.”
The final determination concluded that $252,989.90 was due (tax $164,457.23; penalty $80,309.79; and interest $80,309.79). Since J & J had already paid $258,227, it was credited an amount of $5,237.09.

FINDINGS

(A) Appropriateness of Summary Judgment

Summary judgment will be granted “if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.” R. 4:46-2(c); Brill v. *544 Guardian Life Ins. Co. of Am., 142 N.J. 520, 523, 666 A.2d 146 (1995).
It is undisputed that J & J did not pay sales tax to its vendors at the time it purchased the Wanner parts or replacement parts. It is also undisputed that J&J provided 10,318 Warmers/Display eases free of charge, and sold 752 of them during the audit period to its customers. Although Taxation was prepared to provide a credit for taxes paid on sales directly drop-shipped to out-of-state customers, J&J has not provided any proof in this regard. Therefore, all of the 752 sales are deemed to be made to J & J’s customers after the Warmer parts were first shipped to New Jersey by J & J’s vendors, then assembled and distributed by J & J to those customers. Since it is also undisputed that J&J paid tax upon Warmers sold or delivered by J & J within New Jersey, all of the assessed transactions are deemed to be out-of-State.
The issues are thus whether the use tax is properly imposed if the purchase transactions are exempt, and if not exempt from tax, is Taxation estopped from the assessment because of its 1993 final determination. These issues can be disposed by summary judgment.
Before the court begins its analysis, it notes that an assessment of sales or use tax “is presumptively correct.” Quest Diagnostics v. Director, Div. of Taxation, 21 N.J.Tax 484, 490 (Tax 2004). The burden is upon the taxpayer to prove otherwise. Yilmaz v. Director, Div. of Taxation, 22 N.J.Tax 204, 231 (Tax 2005). Because of the presumption of taxability, claims of exclusion or exemption are “strictly construed” against the claimant. Urso & Brown, Inc. v. Director, Div. of Taxation, 19 N.J.Tax 246, 254-255 (Tax 2001), aff'd, 353 N.J.Super. 248, 802 A.2d 543 (App.Div.2002).

(B) Imposition of Use Tax

The “primary purpose of the [use] tax” is to capture lost revenue “when tangible personal property [is] purchased out-of-state and therefore not subject to” the sales tax, but the purchased property “is nonetheless used here to the same extent as is *545 property purchased here for which New Jersey sales tax is paid.” Diamondhead Corp. v. Director, Div. of Taxation, 4 N.J. Tax 255, 257-258 (Tax 1982). Unlike sales tax which is required to be collected by the seller from the customer at the time of the purchase, in trust and on behalf of Taxation, and then paid by the seller to Taxation, the use tax is imposed upon the user of the tangible personal property, and is assessed/eollected from such user. See N.J.S.A. 54:32B-12; 54:32B-6.
N.J.S.A. 54:32B-6(A) imposes a compensating use tax upon a person for the “use” of any tangible personal property in this State, which property was purchased at retail, and for which no sales tax was paid. In this connection, the term “use” means the “exercise of any right or power over tangible personal property by the purchaser” which “includes ... the receiving, storage or any keeping or retention for any length of time, withdrawal from storage, ... any consumption of such property.” N.J.S.A. 54:32B-2(h).
Here, it is undisputed that J&J made retail purchases of the M2000 Warmer parts from vendors and did not pay sales tax on them. It is also undisputed that J&J received the parts in New Jersey. It is also agreed that J&J subsequently assembled the parts within the State into Warmers, tested the same, and then either sold or distributed them to its customers. It thus received the Warmer parts, and, further, exercised power/control over the same. Therefore, its retail purchases of the Warmer parts are taxable under N.J.S.A. 54:32B-6(A).

(C) Are J & J’s Purchases Non-Taxable Under N.J.S.A. 54:32B-6(B) ?

Tax is also imposed for the use of any tangible personal property “assembled” by the user, “if items of the same kind of tangible personal property are offered for sale by [the user] in the regular course of business.” N.J.S.A 54:32B-6(B). J&J maintains that it sells Warmers regularly as evidenced by an “entire sales department which contacts customers and potential customers,” thus, falls within N.J.SA 54:32B-6(B). Nonetheless, it *546 argues, the tax does not apply because the same statute deems “the mere storage, keeping, retention or withdrawal from storage of tangible personal property ... by the person who manufactured, processed or assembled such property” as a nontaxable use. Ibid. It contends that similar to the retention and storage in Cosmair, supra, J&J assembles Warmers in New Jersey, then stores them here until they are shipped to its out-of-state customers. Thus, its use of the M2000 Warmer parts is nontaxable.
Taxation maintains that N.J.S.A. 54:32B-6(B) does not apply in the first place because J&J manufactures and sells snack food items in its regular course of business, not Warmer parts. When the statute does not apply, Taxation argues, the exclusionary language is irrelevant.
N.J.S.A. 54:32B-6(B) applies only “if items of the same kind of tangible personal property ... are offered for sale by [the user] in the regular course of business.” N.J.S.A 54:32B-6(B) (emphasis added). Clearly, J & J is not selling Warmer parts which it assembles in New Jersey. Therefore, N.J.S.A 54:32B-6(B) would not apply to the present audit which assessed use tax on purchase of the Warmers parts.
J&J argues that since the Warmers are promotional aids, their use and display by the customers are to ensure enhanced or increased sales of J & J’s products, namely, the pretzels. Therefore, the Warmers are undeniably distributed in J & J’s regular course of business. This argument requires an analysis of whether J & J’s distribution (which includes sales and loans) of the Warmers equate to the statutory requirement that the tangible personal property be “offered for sale.”
As noted before, J&J sells the M2000 Warmers to food vendors who or which purchase less than two to three eases of frozen pretzels a week. Although J&J prefers the use of only the M2000 Warmers because they maintain the quality of the pretzel when warmed-up, there was nothing to show that its customers are required to buy the Warmers as part and parcel of the purchase of pretzels because of this “quality” factor. In any event, no food vendor can buy the M2000 Warmers from J&J *547 independent of the frozen pretzels. These factors tend to establish that the Warmers are not “offered for sale” as required by the statute. Moreover, the Warmers which are loaned free-of-charge to J & J’s customers who place larger orders for frozen pretzels are not offered to them for sale.
However, it is undisputed that some are indeed sold,[7] which in legal parlance requires they be preceded by an offer for sale, even if contingent upon another condition (purchase of pretzels). Nonetheless, the facts do not support a conclusion that the further exclusion from tax for property sold in the regular course of business applies. The court is not persuaded that J & J’s “use” consisted of storage of the Warmers or withdrawal of the Warmers from storage, both of which activities, when performed by a manufacturer or assembler of the tangible personal property, are excluded from use tax. The Warmers parts are ordered from outside vendors only after J & J’s service department receives a request from the sales department. J&J does not keep an inventory of the Warmers or parts. It does not keep track of the parts or the Warmers in any data system. Returned Warmers are repaired or replaced by simply checking the type of model (model number).
Additionally, upon receipt, the Warmer parts are assembled, tested, and shipped out in a quick turn-around process. As soon as the parts are received, J & J’s employees assemble the same into a Warmer, “plug it in, the lights work, three turns, put it in a box and ship it [right] out.” Thus, there is no retention (inventory) of the parts or the assembled Warmers. For purposes of the *548 exclusion under N.J.S.A 54:32B-6(B), the possession of the Warmer parts during and in the course of the assembly process is not “storage.” Neither is the act of placing the assembled Warmers into a package for shipment by UPS, a “withdrawal” from “storage.”
J&J argues that its activities of assembling Warmers and shipping them to its customers under the Location Agreement are no different than the activities of the taxpayer in Cosmair, swpra, namely, taking samples of its products from its warehouse and distributing the same to out-of-state customers as part of its marketing program. Since the Supreme Court ruled that Cosmair’s “use” was not taxable, J & J’s “use” of the Warmers is similarly non-taxable.
Taxation points out that it is not taxing J & J’s “use” of the assembled Warmers. Rather it is only imposing a tax on the Warmer parts purchased tax-free by J & J, the “use” being taxed under N.J.S.A 54:32B-6, and under N.J.S.A 54:32B-2(h) (defining use to include “receiving” personal property, and such receipt not being deemed an nontaxable “use” in any other statute). Moreover, Taxation argues, Cosmair is factually dissimilar because unlike there, here J&J retains ownership of the loaned/distributed Warmers at all times, thus, it maintained and exercised control over them, which in turn, makes the use taxable.
In Cosmair, supra, the taxpayer manufactured perfumes and cosmetics in New Jersey and stored them in a warehouse which was also in New Jersey. 109 N.J. at 564, 538 A.2d 788. No use or sales tax was paid for the raw materials (perfume/cosmetic ingredients) which were purchased out-of-state or in-state. Ibid. As part of its marketing program, the taxpayer provided free samples to its customers (department stores) for distribution to consumers/shoppers, who in turn also gave out free samples to those consumers. Id. at 564, 565, 538 A.2d 788. After the sample amount to be distributed was decided, the taxpayer’s New York marketing/sales department conveyed that information to the New Jersey warehouse, which then packaged, labeled and had them picked up by a common carrier for distribution out-of-state. Ibid. *549 The amount of samples given by the taxpayer to its customers (the department stores) had no relation to the amount of cosmetics/fragranees purchased by them from the taxpayer. Id. at 565, 538 A.2d 788. The parties agreed that the samples were manufactured by the taxpayer, and were “of the same kind and size” of personal property offered by the it “in the regular course of [the taxpayer’s] business.” Id. at 566, 538 A.2d 788.
The Supreme Court initially disagreed with the taxpayer and held that a manufacturer is liable for use tax “when it purchases property and exercises ‘any right or power’ over it.” Id. at 568, 538 A.2d 788. The Court then disagreed with Taxation that the taxpayer’s activities of determining the quantity of samples to be shipped, preparing for their shipping, and getting them shipped out-of-state were taxable uses because they exceeded the activities of “mere withdrawal from storage” a nontaxable use. Id. at 569, 538 A.2d 788. The Court ruled that the “plain language” of N.J.S.A. 54:32B-6(B) evidenced clear legislative intent of exempting from tax, “a manufacturer’s activities” of storing or withdrawing from storage, “the manufacturer’s products.” Id. at 570, 538 A.2d 788. Any activities “incidental” to storage or withdrawal from storage was also legislatively intended to be exempt. Ibid. The Court held that the taxpayer’s activities of shipping the samples from the New Jersey warehouse to the out-of-state customers were thus incidental to the nontaxable removal from storage, and therefore, also nontaxable. Id. at 571, 538 A.2d 788.
The main holding in Cosmair was thus an interpretation of the extent (quality and quantity) of “storage” and “withdrawal from storage” activities, not the initial taxability of the use tax on purchases. See id. at 564, 538 A.2d 788 (issue before the Court was “limited solely to ... whether [taxpayer’s] samples are excepted from use tax under the ‘mere storage, keeping, retention or withdrawal from storage’ exemption in N.J.S.A. 54:32B-6”).
Here however, the audited assessment is of the purchase of Warmer parts. Whereas in Cosmair, supra, there was no issue as to the taxability of the raw materials purchased to manufacture the samples. As this court has previously found, J&J has a *550 taxable use when it receives the Warmer parts in New Jersey. Such receipt is not one of the nontaxable uses listed in N.J.S.A. 54:32B-6(B). Cosmair, supra, did not hold otherwise. See 109 N.J. at 569, 538 A.2d 788 (taxpayer did not “receive the samples” so as to be subject to use tax, and did not perform any of the activities defined as a taxable use, except for “storage, keeping, or retention ... or withdrawal from storage of the samples.”).
The court finds persuasive Taxation’s argument that Cosmair is inapplicable to the facts here. Neither the parts nor the Warmers are part of J & J’s inventory. J&J does not perform any storage activities of the parts or the Warmers. Nor is there any withdrawal from storage. Although J & J’s brief simply asserts that the Warmers are stored in New Jersey, and the answers to interrogatories state that the Warmers are “stored” in Bellmawr, the deposition responses evidences that J&J does not store the assembled Warmers. Whereas in Cosmair, the taxpayer-manufactured fragrances and cosmetics were stored in a warehouse until they had to be shipped out. Deeming the assembly time as “storage” or “retention,” and the immediate shipping of the assembled M2000 Warmers as “withdrawal from storage” stretches the holding in Cosmair beyond its logical interpretation.
To the extent J&J deems the contested assessment to be a tax upon the Warmers themselves, Cosmair is also distinguishable in that unlike the samples in Cosmair, the Warmers are provided free of charge only to those customers who place sufficient orders for pretzels. Unlike Cosmair, the Warmers are not distributed free to the ultimate consumers. Unlike Cosmair, the ownership and title to the loaned Warmers remain with J & J at all times, with J&J retaining the right to re-possess them at any time.[8] Thus, its taxable use does not terminate upon distribution of the Warmers.
*551 Therefore, the court finds that N.J.S.A 54:32B-6(B) does not apply. Even if it does, the exclusion in that statute does not apply.

(D) Are the Purchases Exempt Under N.J.S.A 54:32B-8.13?

J&J maintains that its purchases of the Warmer parts are exempt from tax because it is part of the manufacturing process of the Warmers, and the use of the Warmers is part of the manufacturing process of the pretzels. J&J maintains that the frozen pretzels sold to its customers are in a raw material stage, and the thawing/warming up is required to make them edible for the final consumer, which is the “final step of manufacture,” and this final step is achieved by using the M2000 Warmer. It maintains that simply because the thawing, warming, and sale of the edible pretzel is not undertaken by J & J, does not require denial of the exemption especially when most of the M2000 Warmers are owned by J & J (i.e., only loaned to its customers). Thus, J & J’s customers’ use of the Warmers, are a part of the manufacturing process.
Taxation argues that the manufacturing process ends when the frozen pretzels are sold to J & J’s customers. Per Taxation, neither the Warmer parts nor the assembled Warmers are used in manufacturing the frozen pretzels, rather are marketing devices since they double as display cases with J & J’s logo prominently affixed on them. Therefore, the exemption does not apply.
N.J.S.A. 54:32B-8.13(a) exempts from sales or use tax, any “machinery, apparatus or equipment for use or consumption directly and primarily in the production of tangible personal property by manufacturing, processing, assembling or refining.” However, if the “machinery, equipment or apparatus” purchased is for a “use” that is “incidental to the activities described in” N.J.S.A. 54:32B-8.13(a), then there is no tax exemption. Ibid. See also N.J.A.C. 18:24-4.4(a) (reiterating the statute). In this connection it should be noted that the exemption applies even if the tangible personal property produced by the machinery, apparatus or equipment is used to produce other tangible personal property, and the *552 latter is sold directly to the consumers. GE Solid State v. Director, Div. of Taxation, 132 N.J. 298, 625 A.2d 468 (1993).
Taxation’s regulations provide the definitions of many of the terms in the statute. Thus, the term “machinery, apparatus or equipment” is defined as:
any complex, mechanical, electrical or electronic device, mechanism or instrument which is adapted to the accomplishment of a production process, and which is designed to be used, and is used, in manufacturing, converting, processing, fabricating, assembling, or refining tangible personal property for sale.
[N.J.A.C. 18:24-4.2]
The term “production” is defined as being “limited to those operations” which start with the “introduction of raw materials into a systematic series of manufacturing ... assembling operation” and ends “when the product is in” its final form, i.e., ready for sale to the “ultimate consumer.” N.J.A.C. 18:24-4.4(b) (emphasis added).
The court is not persuaded that the M2000 Warmer parts are “machinery, apparatus or equipment.” Although the assembly process takes 19 steps, the Warmer parts are not shown to have been a “complex, mechanical, electrical or electronic device, mechanism or instrument____” See e.g. Hospital Portrait Srvcs. v. Director, Div. of Taxation, 6 N.J.Tax 305, 313 (Tax 1983) (photographic film is not a complex device that fits within the definition of “machinery, apparatus or equipment” which term cannot be given a broad interpretation), aff'd, 7 N.J.Tax 431 (App.Div.1984), certif. denied, 101 N.J. 235, 501 A.2d 912 (1985).
The court also finds Taxation’s argument persuasive that the manufacturing exemption does not apply because the Warmers are not used in the production of the frozen pretzels. It is undisputed that J & J is a manufacturer of snack foods. It is further undisputed that J&J does not use the M2000 Warmers in converting the pretzel raw material into a frozen pretzel. Nor does J&J use the Warmers to produce ready-to-eat edible pretzels. Rather, J&J sells or loans the Warmers to its customers, and it is undisputed that these customers are retail food vendors. There is no requirement that the customer use a M2000 Warmer. The sales of M2000 Warmers are required only *553 as a business strategy, namely, to induce and encourage buyers to increase their frozen pretzels purchase orders or face increased costs (by requiring purchase of the Warmers). The loans of Warmers are also a business/inducement strategy being a bonus or reward for customers purchasing larger amounts of frozen pretzels. Indeed, the Warmers are akin to the example provided in N.J.A.C. 18:24-4.4(b) which defines “production” and notes that the term “does not include any activities which are distributive in nature. For example, a machine which packs a product into shipping cases after the product is in the form in which it will be purchased by the ultimate consumer is not considered to be used in production.” See also Urso & Brown, supra, 19 N.J.Tax at 259-260 (prototypes of display purchased from third-party vendors and used primarily as sample/marketing/sales device are not exempt under the manufacturing exemption, even if used occasionally as a basis for measuring the manufacture of the final display, because they are not “integral to, and integrated into, the manufacturing process”).
It is J & J which is seeking a tax exemption for its purchases of the Warmer parts. Therefore, the determinative factor is J & J’s use of the Warmer parts vis-a-vis its manufacturing activities. Thus, even if J & J prefers its customers to use the M2000 Warmers, and deems those Warmers as a “critical component” of the manufacturing process (in its brief), the court does not find, based on the facts in the record, that the M2000 Warmer parts purchased by J & J are entitled to a manufacturing exemption under N.J.S.A. 54:32B-8.13. And even if it is presumed that the M2000 Warmers (as opposed to the Warmer parts which are being taxed in the instant challenged assessment), are “machinery, equipment or apparatus,” J & J’s purchases of the parts and assembly of the Warmers are at most, for an incidental use, namely, as a sales/marketing device, when compared to its primary manufacturing activity (manufacturing and/or producing frozen pretzels). N.J.S.A. 54:32B-8.13(a) does not exempt incidentally used purchases.
Taxation notes that because J&J expenses the costs of the Warmers (parts and labor), does not include the Warmers as *554 “plant and equipment” on its balance sheet, and does not include Warmers as assets if they have a “useful life” of less than a year, the Warmer parts are taxable under N.J.A.C. 18:24-4.3(a)(4). This regulation taxes “parts with useful life of one year or less” regardless of how such parts are used or intended to be used. However, as J & J correctly points out, the term “parts” is defined by Taxation’s regulations applicable to the manufacturing exemption as replacement parts only. See N.J.A.C. 18:24-4.2. Thus, to the extent Taxation’s argument addresses even the original Warmer parts as being taxable under N.J.A.C. 18:24-4.3(a)(4), it is unpersuasive. However, to the extent, the present audit also included replacement parts in the 34% taxable transactions, N.J.A.C. 18:24-4.3(a)(4) would apply to uphold the tax.

(E) Is Taxation Estopped from Taxing J&J Because of its 1993 Final Determination?

J&J argues that Taxation is equitably estopped from imposing an assessment because of its 1993 final determination where it conceded that sales or distributions of the Warmers to J & J’s out-of-state customers is not subject to use tax pursuant to Cosmair, supra. J&J also maintains that the assessment is unsupportable under the principle of laches.
Taxation argues that the principles of estoppel or laches do not apply to governmental agencies, particularly those involving tax cases. It also contends that the 1993 audit did not involve the same facts or legal issues because J & J’s 1992 administrative protest had focused only on sales of the Warmers (since it had argued a “sale for resale” exemption), whereas the present audit has included only the Warmers which were loaned, thus, J & J’s basis for arguing exemption is under different grounds.[9] It also claims that it has no information about the 1992 audit conclusions, therefore, it does not know what facts were provided to the *555 auditor then, and whether they are the same as the facts obtained in the present audit and litigation.
Equitable estoppel “requires a party to show that an adversary engaged in conduct that induced reliance, and that the party acted or changed position to the party’s detriment.” Prime Accounting Dep’t v. Township of Carney’s Point, 421 N.J.Super. 199, 211-212, 23 A.3d 427 (App.Div.2011), rev’d on other grounds, 212 N.J. 493, 58 A.3d 690 (2013).[10] See also M.J. Ocean, Inc. v. Director, Div. of Taxation, 23 N.J.Tax 646, 655 (Tax 2008) (party must show that “an officer of the State, conscious of the State’s true interest and aware of the private [party’s] misapprehension, stood by while the private [party] acted in detrimental reliance”) (citation omitted), certif. denied, 198 N.J. 473, 968 A.2d 1189 (2009); Gale Builders, Inc. v. Hunterdon County Bd. of Taxation, 8 N.J.Tax 16, 22-23 (Tax 1985) (“party against whom estoppel is urged” knowingly misrepresented or concealed “material facts inconsistent with his present claim” so as to “influence the conduct of another” and the other party “ignorant of’ or unable to “ascertain” those facts, “relied” on the same “in good faith” to his/her/its prejudice).
The doctrine of laches is “invoked to deny a party enforcement of a known right when the party engages in an inexcusable and unexplained delay in exercising that right to the prejudice of the other party.” Prime Accounting, supra, 421 N.J.Super. at 212, 23 A.3d 427 (citations omitted). A claimant must prove that the “delaying party had sufficient opportunity to assert the right in the proper forum and the prejudiced party acted in good faith believing that the right had been abandoned.” Ibid.
Both doctrines are equitable remedies. Therefore, courts “must ultimately determine whether application of either doctrine is equitable.” Ibid. In doing so, it should be noted that the doctrines are not “lightly invoked ... especially in tax matters, *556 where the public interest is so vitally affected.” Mayfair Holding Corp. v. Township of N. Bergen, 4 N.J.Tax 38, 41 (Tax 1982). Application is justified only “in extreme circumstances” and in the absence of any “prejudice [to] essential governmental functions.” Prime Accounting, supra, 421 N.J.Super. at 212, 23 A.3d 427 (citations omitted).
The majority of cases have held that Taxation’s “change in position” (i.e. conduct) inducing alleged reliance does not invoke equitable estoppel. Thus, in Airwork Serv. Div. v. Director, Div. of Taxation, 97 N.J. 290, 294, 478 A.2d 729 (1984), aff'g 2 N.J.Tax 329 (Tax 1981), cert. denied, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985), Taxation had issued a press release in June 1966 that repair services on articles shipped post-repair, to out-of-state customers, were exempt from sales tax. It had audited the taxpayer in 1967 but did not impose any sales tax on the repair services performed by the taxpayer. Id. at 296, 478 A.2d 729. Subsequently, due to a final decision in another case,[11] Taxation notified taxpayers in two “consecutive late-1973 issues” that the repair services performed in New Jersey for out-of-state customers, were taxable. 2 N.J.Tax at 338.
Taxation conducted another audit of the taxpayer for the period August 1971 to June 1973, and by a 1974 final determination, assessed tax on the same repair services. Id. at 337. The audit period was “prior to the State Tax News publication” but after the August 1971 decision of the “Division of Tax Appeals decision in the Fisher-Stevens ease.” Id. at 342-43.
The Court ruled that the taxpayer’s reliance upon the prior audit did not equitably estop Taxation’s subsequent assessment for the same repair services, and that the taxpayer “should have” been on notice that its “services were taxable” since Taxation was actively litigating the issue. Id. at 294-95. Noting that the *557 “application of this equitable doctrine is extremely fact-sensitive,” 97 N.J. at 297, the Court held:
when a sales tax statute specifically provides for the taxation of particular transactions and does not explicitly provide for the tax exemption of such transactions, estoppel should not generally be available to a subject taxpayer. The strong public and governmental interest in the collection of the tax imposed by the Legislature will usually outweigh the asserted reliance by a taxpayer, especially when such reliance is claimed to be based on unofficial statements and equivocal administrative inaction.
[Id. at 299] (emphasis added)
In Black Whale, Inc. v. Director, Div. of Taxation, 15 N.J.Tax 338, 344 (Tax 1995), equitable estoppel did not prevent assessment on a boat which an auditor had previously notified the taxpayer was exempt, but as to which Taxation later changed its position, despite the fact that there was no change in the operation of the boat. The court found that in a commercial context Taxation “would have been estopped from changing [its] position” especially where the investigator assigned to the case “was a specialist in the New Jersey sales taxation of boats” who “could have asked any number of questions as he knew more about the taxation of boats than” the taxpayer which had fully co-operated with the investigator, nonetheless, the “law” was “different” for State agencies. Id. at 352. The court found that Taxation is “estopped from making an assessment contrary to [a] prior written representation [only] if a compromise or closing agreement is executed with the statutorily prescribed formalities [under] N.J.S.A. 54:53-1 to -16.” 15 N.J.Tax at 357.
However, the application of the equitable doctrine is not completely foreclosed when there has been a change in Taxation’s position or policy. In Toys “R” Us, Inc. v. Director, Div. of Taxation, 300 N.J.Super. 163, 692 A.2d 111 (App.Div.1997), Taxation audited and assessed taxpayer with sales taxes on labels, which it paid and did not appeal. Prior to the audit, Taxation had issued an article in the State Tax News which interpreted the statutory exemption for labels, and stated that labels were generally taxable. Id. at 166, 692 A.2d 111. Around the same time as the audit was finalized, but “at least a month before the plaintiff paid the assessment,” Taxation issued a “superseding notice” of *558 the prior article and stated that the labels were tax-exempt. Id. at 166-67, 692 A.2d 111. The taxpayer promptly filed a refund claim but was denied because it was untimely filed. Ibid.
The court held that unlike the press release in Airwork, supra, Taxation’s “original position” as to the taxability of labels was in an “official publication.” 300 N.J.Super. at 172, 692 A.2d 111. Nor was there any proof that the “information was outdated, or that the publication was inaccurate or that the administrative conduct was equivocal.” Ibid. If at the time of the audit Taxation had “changed its position, then the assessment was a mistake.” Ibid. Since a “[ejareful examination of the facts” was required especially because of the “taxpayer’s Bill of Rights” (N.J.S.A 54:48-1 et seq.), which provided taxpayers with “basic rights of fair and equitable treatment,” the court remanded the matter for a factual hearing. 300 N.J.Super. at 172, 692 A.2d 111.
Subsequent cases have limited the application of Toys “R” Us factually and have continued to adhere to the precedent that estoppel rarely applies to government entities. See M.J. Ocean, supra, 23 N.J.Tax at 656-657 (Toys “R” Us decision allowing the “taxpayer” an “opportunity to establish grounds for estoppel or other equitable relief’ was pursuant to “unusual circumstances” and the facts were “not analogous to those in Toys “R” Us," because “plaintiff was chargeable with the knowledge” of the statute of limitations for refund claims); Amplicon, Inc. v. Director, Div. of Taxation, 18 N.J.Tax 129, 145-14 (Tax 1998) (Toys “R” Us was the “lone exception” and “a departure from a long line of eases” which strictly construed statute of limitations, but nonetheless “did not overrule that long line of cases, and accordingly, must be limited to its facts”); Marrinan v. Director, Div. of Taxation, 17 N.J.Tax 47, 59 (Tax 1997) (Toys “R” Us facts “substantially different from, and substantially more compelling than, the facts presented by plaintiffs” thus Taxation’s issuance of a refund check based on an amended return did not estop a subsequent tax assessment based on an audit of that return).
Based on the facts here, the court finds that laches does not apply. Taxation did not prevent J&J from appealing its 1993 *559 final determination which required it to pay tax on the use in New Jersey. Further, the taxing statutes do not bar Taxation from auditing prior tax years (provided it is done within the permitted statute of limitations in this regard), nor do they foreclose Taxation from auditing the same taxpayer more than once. Thus, there is no inexcusable delay in Taxation’s conducting its present audit.
As to estoppel, based on the evidence in the record, the court is not persuaded by Taxation’s arguments that J & J’s prior and present audit are radically dissimilar as to facts and/or legal issues. The Warmers at issue in the 1993 audit were identical to the M2000 Warmers at issue here, even if the latter is a more modernized version and has a new name. The transactions involving the Warmers by J & J is the same, namely, purchase of parts from outside vendors, their assembly by J & J in New Jersey; and their subsequent distribution (by sale or loans) by J & J to its out-of-state customers. The same account 6350 which J&J uses to record its purchase transactions for the Warmer parts/Warmers, was the focus of both audits. The same Location Agreement for loans of the Warmers was being used during both audits.
Taxation notes that the 1992 protest evidenced that only sales of the Warmers were at issue, not loans of the same, since the legal issue was whether an exemption lies on a “sale for resale” basis. However, it fails to acknowledge that its 1993 final determination does not use the term “sale” or “sold” but states that “only the ... promotional and marketing equipment which is delivered to [J & J’s] New Jersey customers for use in this State is subject to” sales and use tax (emphasis added).
Additionally, J & J’s administrative protest of the 1992 audit referenced the Location Agreement. Although it noted that the Location Agreement was for a “purchase” of the Warmers, its legal analysis was that the Warmers were in the “possession” of the customers, and the legal definitions of “sale” and “resale” include the term “possession” because J&J was relying upon the sale-for-resale exemption Both of the Location Agreements relied upon by Taxation required a refundable deposit. If these Agree *560 ments were for sales per Taxation, there would be no need for this provision. This holds true even if in fact, J&J almost never collected the deposits. The depositions of J & J’s employees also indicated that there was very little substantive change in the Location Agreements, one being older and one newer, except as to the items listed therein (¿a, pizza ovens and the like) or the model numbers of the Warmers.
Thus, regardless of the fact that J&J filed sales tax returns since 1993 and called it sales tax, the transactions at issue then and now included a consideration of the Warmers assembled in New Jersey but delivered by J & J to its out-of-state customers. J & J’s employee’s certifications as well as depositions only indicate uncontradicted evidence that J & J’s transactions, operations, and assembly process regarding the M2000 Warmers, remained unchanged from the time prior to the 1992-93 audit through the present audit although the M2000 Warmers changed its name from the version used in the 1992 audit to indicate its upgrade.
Nonetheless, the court finds that estoppel does not apply here. It is difficult to agree that Taxation’s interpretation of Cosmair and application of the Court’s holding to the facts in J & J, is a “knowing and intentional misrepresentation” which induced J&J to continue its non-payment of use tax on Warmer parts at issue. Indeed, the facts were the same then and now as J & J itself asserts. Further, the auditor in the present audit examined the Warmer parts purchases only because he wondered why J&J was filing sales tax returns and paying sales tax when all of J & J’s food sales were exempt as being for resale. Thus, it is not as if Taxation deliberately sat by and allowed J & J to continue is nonpayment of use tax and then decided to audit J & J for the same.
Further, J & J did not present any specific facts to substantiate “detrimental reliance.” From the moving papers, the court gleans the presumable detriment to be the financial burden J&J now faces from the assessment of tax, interest and penalty, which arose only because it had presumably relied upon the 1993 final *561 determination which had led J & J to believe that its out-of-state shipment of the Warmers were not subject to use tax.
It should be noted that J&J had never at any time, paid use tax on the Warmer parts which it assembled and shipped to its out-of-state customers. The 1993 final determination had J&J start paying taxes on the Warmers sold/delivered in New Jersey. The present audit did not change that. It should also be noted that both audits addressed use tax payable by J & J as opposed to sales tax which is collected from the customers. Thus, J&J cannot credibly allege that it is harmed because it is foreclosed from collecting the tax from its customers.
In weighing the public versus private interests in applying the equities, it cannot be seriously disputed that Taxation’s imposition of the present assessment is legal, pursuant to statutory authority, and a part of its “essential governmental function” which impacts “public interest.” J & J’s interest in being able to rely upon the finality of the 1993 final determination is credible, but does not present the extreme circumstances warranting application of equitable estoppel.
It is true that in cases involving Taxation’s ability to recoup erroneous refunds, courts have held that Taxation cannot revisit its final determination unless to correct a clerical or mathematical mistake. See e.g. Playmates Toys, Inc. v. Director, Div. of Taxation, 162 N.J. 186, 742 A.2d 968 (1999) (Taxation can recoup erroneous refunds if the error was a clerical) (relying upon Lockwood v. Walsh, 137 N.J. Eq. 445, 450, 45 A.2d 305 (Prerog.Ct.1946)) and Lenox, Inc. v. Director, Div. of Taxation, 20 N.J.Tax 464, 475 (Tax 2002) (Taxation cannot recoup erroneous refunds if the error was one of judgment, i.e., “an erroneous final determination of the merits of a taxpayer’s liability for tax, resulting from a mistaken interpretation of substantive law or a misunderstanding of the facts relating to the determination”).[12] Here, however, Taxation is not seeking to revisit the audit periods *562 involved in the 1993 final determination, and impose tax on those periods. Nor was there any closing agreement pursuant to the 1993 final determination that Taxation would not seek to impose tax on the purchase of the Warmer parts for any period subsequent to 1993. Therefore, despite the solemnity afforded a final determination, it does not appear that it should merit a different analysis for purposes of equitable estoppel.
Case law is clear that Taxation cannot be foreclosed from making an assessment due to its prior misinterpretation of the law. See Airwork, supra, 2 N.J.Tax at 343-44, where the court held that if Taxation imposed an assessment “in pursuant to statutory authority, such in compliance with the legislative standard embodied” in the statute, then, that “standard cannot be vitiated by an erroneous construction thereof by the Division of Taxation” (relying upon “settled” federal tax law applicable to “to all types of taxes that the Commissioner of Internal Revenue is empowered retroactively to correct mistakes of law in the application of the tax laws to particular transactions, even where the taxpayer relied to his detriment on the Commissioner’s mistake”). This is so “even where the taxpayer proves detrimental reliance upon such construction.” Id. at 344. The reason is that “[n]either defendant nor any official responsible to him is authorized to waive state tax revenues.” Ibid. See also Campo Jersey, Inc. v. Director, Div. of Taxation, 390 N.J.Super. 366, 385 (App.Div.) (“Estoppel may not be applied to compel [Taxation’s] continued application of a mistaken position that it has previously taken, because such a position by definition represented a tax exemption that the Director and his or her employees lacked the authority to grant”), certif. denied, 190 N.J. 395, 921 A.2d 448 (2007).
The court however finds that it is inequitable for Taxation to impose interest and penalty. It is undisputed that between *563 1993 and 2010 (the date of the present audit), J&J was never notified and was unaware of a different interpretation of the application of Cosmair, swpra, to its purchases of the Warmer parts. It is only at the second audit that Taxation discovered and decided that it had erroneously interpreted the application of the holding in Cosmair to J & J’s purchases of Warmer parts. Had J & J known that its purchases of the Warmer parts was subject to use tax, it may have made a business decision to pay the use tax and thus, would not have accrued any interest. Penalty is particularly inappropriate because J & J did not deliberately choose to avoid paying use tax. Indeed, Taxation’s own regulations recognize that if an issue is pending administrative or legal determination, and subsequent tax periods involve the identical facts and issues, then there is reasonable cause to abate interest and penalties for the subsequent periods. See N.J.A.C. 18:2-2.7(4). Although there was no pending proceeding during the contested assessment, the logic of the regulation would apply here since the 1993 final determination was accepted by J & J, and the subsequent audit periods involve the identical facts and issues.
In Airwork, supra, the court held that the second audit itself was sufficient notice and that due process requires only an “opportunity ... to challenge the validity of an assessment ... at some stage before a tax becomes irrevocably fixed as a charge on the taxpayer’s property.” 2 N.J.Tax at 342. However, it is unclear whether the audit there included interest and penalty. Even if it did, there was no statutory mechanism for their waiver. The present case however, does have for consideration the application of N.J.S.A. 54:49 — 11(b), a statute promulgated as part of the “Taxpayer Bill of Rights.” This statute provides that the “director shall waive the payment” penalty or interest if a taxpayer reasonably relied upon “erroneous advice furnished to the taxpayer in writing by an employee of the Division of Taxation acting in the employee’s official capacity.” The waiver is not available if the taxpayer failed “to provide adequate or accurate information.” Ibid. The regulations interpreting this statute provides that “no officer or employee of the Division of Taxation is authorized to provide written advice which is binding on the Division of Taxation *564 in the absence of a written request from a taxpayer.” N.J.A.C. 18:2 — 2.7(d)(1)(iii).
The statute addresses “advice” and the regulations require such advice be preceded by a “written request.” While a written advice in response to a written request would appear to include generic informal information outside of an audit scenario, similar to the federal Private Letter Rulings, the construction is not so limited. See Black Whale, supra, 15 N. J.Tax at 342-44 (letter was sent by a Taxation employee pursuant to an investigation of the taxpayer’s purchases and activities, which investigation resulted in an audited assessment of tax on some boats and for which interest and penalties were abated). Additionally, it is illogical to provide interest and penalty abatement to a taxpayer who or which requests advice on the taxability or otherwise based on facts presented by the taxpayer, but to deny such relief when a final determination is issued, on grounds the latter is not “advice” in the strict sense of the word. Indeed, the final determination process would involve a much more detailed factual/substantive review process, and decision by Taxation, at multiple levels (audit, post-audit conference, and administrative protest with Conference and Appeals). Cf. Gastime, Inc. v. Director, Din. of Taxation, 20 N.J.Tax 158, 165 (Tax 2002) (“Non-applicability of the doctrine of equitable estoppel does not preclude application of the requirement that [Taxation] turn square corners in dealing with taxpayers”).
In sum, it appeal’s that the inconsistent “positions” taken by Taxation’s is based upon an application of case law. Therefore, the court is not persuaded that these are extraordinary or extreme circumstances which outweigh the “strong public and governmental interest in the collection of the tax imposed by the Legislature,” Airwork, supra, 97 N.J. at 299, 478 A.2d 729, such that equitable estoppel applies. Nonetheless, Taxation should have abated the penalty and interest because it was its 1993 final determination that caused J & J to not pay use tax on its purchases of the Warmer parts.

*565
CONCLUSION

For the aforementioned reasons, Taxation’s motion for summary judgment is granted in part. J & J’s cross motion is denied. An Order and Judgment in accordance with this opinion will be issued.

 J & J also manufactures and sells other products such as churros, funnel cakes, and cookies under brand names.

 The Parent owns 100% of J & J Snack Food Investment Corp., which in turns owns 100% of plaintiff J&J.

 The 19 steps involve securing certain parts with screws after they are manually attached (such as the legs, drive motor, ground wire, frame door), and manually attaching or assembling other parts (light bulbs, plexiglás sides, plastic top, wires).

 J & J also uses other models such as "850” and “825.” These are not assembled in New Jersey but are ordered from a third-party vendor which ships the warmers to J & J’s customers directly.

 The entity which was audited was J&J Snack Foods of New Jersey, which merged into plaintiff J & J in 2002.

 One such vendor was Wisco Industries, which sold, among others, parts for the M2000 Warmers to J & J, and which purchases were recorded by J & J in general ledger account number 6350 (the same one as in 1992), as "display cases and parts.”

 Taxation points out that the numbers of sales (752) is about 7% of the number provided tree of charge (10,318). However, the total sales whether direct or indirect, i.e., whether drop-shipped by J & J's vendors or shipped by J & J from New Jersey to its customers, should be considered for purposes of N.J.S.A. 54:32B-6(B). This would include the remaining 66% which the auditor excluded from his assessment of use tax. However, Taxation makes a valid point in this regard by noting that in 2006 the Warmer sales were only 220, which at the alleged sale price of $376 per Warmer, provides $82,720, which is less than .04% of the gross receipts from pretzel sales of $212,720,027, indicating that the sales are not the predominant business of J & J, thus, not in J & J’s regular course of business.

 Since the Location Agreement evidenced that J&J retained ownership over the Warmers, and restricted their use only for the display/warming up of J & J’s products, J & J’s assertion in it reply brief that there is "no evidence by either party as to how the pretzel warmers purchased by the customers were actually used as there was no restrictions on such use” is not credible.

 As noted earlier, Taxation was willing to reduce the assessment if J & J could provide information whether the 752 sales (or a portion of them) were to out-of-state customers. Such information was not provided.

 The Supreme Court specifically "concur[red]" with the lower court's "rejection of ... equitable estoppel and laches arguments for the reasons set forth in the panel's opinion.” Prime Accounting, supra, 212 N.J. at 515-16, 58 A.3d 690.

 That case was Fisher-Stevens, Inc. v. Director, Div. of Taxation, 121 N.J.Super. 513, 298 A.2d 77 (App.Div.1972) (affirming the August 1971 decision of the Division of Tax Appeals that sales of direct mailing services performed in New Jersey on mail to out-of-state addresses were taxable), certif. denied, 62 N.J. 575, 303 A.2d 327 (1973).

 It should be noted that those cases did not involve a final determination which had granted the refunds subsequently sought to be recouped. It should be *562 further noted that those cases permitted recovery of refunds under the theory of a State agency’s "inherent powers" which, similar to the equitable estoppel principles, involves a weighing of public interest (protection of taxpayers’ money) and the private recipient’s interest (detrimental reliance). Lenox, supra, 20 N.J.Tax at 474-75.